**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20 CR 577-11 |
| | ) | Judge Elaine E. Bucklo |
| RIKITA MITCHELL, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S CLARIFICATIONS TO THE PRESENTENCE
INVESTIGATION REPORT, SENTENCING MEMORANDUM,
<u>AND POSITION ON SUPERVISED RELEASE CONDITIONS</u>**

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   CLARIFICATIONS TO THE PRESENTENCE INVESTIGATION REPORT ................... 2

   A.  PART A: THE OFFENSE
      Charge(s) and Conviction(s) (PSR, p. 5, ¶7) ....................................... 3

   B.  PART C: OFFENDER CHARACTERISTICS
      Personal and Family Data (PSR, p. 14, ¶60) ........................................ 3

III.  POSITION ON THE ADVISORY SENTENCING GUIDELINE RANGE ......................... 3

IV.  SENTENCING MEMORANDUM .......................................................................... 4

   A.  Legal Standards .................................................................................... 4

   B.  Nature and Circumstances of the Offense—§3553(a)(1) .................... 5

   C.  History and Characteristics of Defendant—§3553(a)(1) ..................... 7

      1.   Ms. Mitchell's Chaotic Upbringing that Included Drug Abuse,
          Sexual Abuse, and Violence Left Lasting Scars. ........................ 8

      2.   Ms. Mitchell's Long-Term and Untreated Mental Health Problems. ....................... 10

      3.   Ms. Mitchell's Precarious Physical Health Conditions. ........................... 12

      4.   Ms. Mitchell's Pretrial Release Issues. .......................................... 13

   D.  A Sentence Involving No to Minimal Additional Incarceration Would Comply with the Factors Set Forth in §3553(a)(2). .................................. 14

      1.   Deterrence Concerns are Served by a Sentence Involving
          No to Minimal Additional Incarceration. ........................................ 14

      2.   A Sentence That Involves No to Minimal Additional Incarceration
          Would Reflect the Seriousness of the Offense, Promote Respect for
          the Law, and Provide Just Punishment. ....................................... 16

   E.  A Sentence Involving Minimal Incarceration Would Satisfy §3553(a)(6) ....................... 17

V.   SENTENCING RECOMMENDATION .................................................................. 18

VI.  POSITION ON SUPERVISED RELEASE CONDITIONS ............................................ 19

## **TABLE OF AUTHORITIES**

**Cases**

*Concepcion v. United States*, 142 S. Ct. 2389 (2022) ...................................................................... 4

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................................. 4, 17

*Kimbrough v. United States*, 552 U.S. 85, 108 (2007) ............................................................... 4, 5

*Pepper v. United States*, 131 S. Ct. 1229 (2011) ...................................................................... 4, 8

*United States v. Brady*, 2004 U.S. Dist. LEXIS 589,
    2004 WL 86414 (E.D.N.Y. Jan. 20, 2004) .......................................................................... 17

*United States v. Courtney*, 76 F. Supp. 3d 1267 (D.N.M. 2014) ............................................... 15

*United States v. Henshaw*, No. 16-cr-30049-SMY,
    2018 U.S. Dist. LEXIS 111052, at *19-21 (S.D. Ill. July 3, 2018) ....................................... 14

*United States v. Hill*, 645 F.3d 900 (7th Cir. 2011) ..................................................................... 4

*United States v. Lopez*, 634 F.3d 948 (7th Cir. 2011) .................................................................. 4

*United States v. Santoya*, 493 F. Supp. 2d 1075 (E.D. Wis. 2007) .............................................. 5

**Statutes**

18 U.S.C. §3553(a)(1) ................................................................................................................ 5, 7

18 U.S.C. §3553(a)(2) ............................................................................................................ 14, 16

18 U.S.C. §3553(a)(6) .................................................................................................................. 17

**Other Authorities**

U.S.S.G. §2D1.1(c)(8) .................................................................................................................. 6

U.S.S.G. §3B1.2(b) ....................................................................................................................... 7

**Rules**

Rule 32(c) of the Federal Rules of Criminal Procedure ................................................................ 1

**Other Sources**

National Institute of Justice, *Five Things About Deterrence* ...................................................... 15

Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of
    Punishment*, p. 1, The Sentencing Project, Nov. 2010 .......................................................... 14

Defendant, **RIKITA MITCHELL**, by and through her attorney, **JOSHUA G. HERMAN**, and pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure and 18 U.S.C. §3553(a), respectfully submits the following: Clarifications and Objections to the Presentence Investigation Report ("PSR"), Sentencing Memorandum, and Position on Supervised Release Conditions.

## I.     INTRODUCTION

Rikita Mitchell's tumultuous life has been marred by many hardships that have impacted her in every imaginable way, including by shaping the poor decisions that have brought her before the Court. That reality does not erase her personal agency and acceptance of responsibility. Rather, it contextualizes how her decisions, particularly the short-sighted ones, were influenced by her substance abuse, her life-long mental health problems, and her desperate need for affection and acceptance that flows from a life of abandonment and abuse. That is precisely why Ms. Mitchell became involved in the offense conduct.

As the PSR correctly notes, Ms. Mitchell helped her boyfriend, also charged in the case, sell drugs by sitting passenger seat of a car and handing drugs from her boyfriend to a buyer, and then passing money back to her boyfriend. (PSR, p. 6, ¶12). The government correctly views Ms. Mitchell as having a "minor role" in the offense. In sobering terms, the PSR also notes how Ms. Mitchell allowed herself to be used by this person in even more disturbing ways to earn money. (PSR, p, 18, ¶85). This relationship was another chapter in a sad trail of poor relationships and bad decisions. Counsel submits that key sentencing question is whether Ms. Mitchell is now equipped with the knowledge, tools, and desire to stop the cycle she was trapped in and can now truly address the traumas that contributed to her self-destructive decisions.

Before her arrest, Ms. Mitchell, who has only an 8th grade education, lacked any semblance of a support system, was a chronic user of drugs and alcohol, struggled with untreated mental

illnesses, and suffered from numerous physical ailments, including morbid obesity and heart failure. She deeply regrets not dedicating herself more to the mental health treatment opportunities offered by pretrial services. However, and most importantly, prior to being incarcerated, she finally connected with a therapist and began to see that she must value herself, rather than let others define her worth. She only wishes that the Court will impose a sentence that will not unduly delay her ability to reconnect with that therapist. She also hopes that any sentence imposed reflect the tremendous difficulties she has experienced in the MCC due to her numerous and troubling physical health conditions that have made even the past four months unduly arduous and painful. On top of struggling with obtaining care for these health issues, Ms. Mitchell also contracted COVID-19 and was sent to the hospital just last month.

For all these reasons, Ms. Mitchell respectfully requests a sentence that faithfully adheres to the parsimony clause and is sufficient but not greater than necessary. A sentence anywhere close to the guideline range would be greater than necessary, counterproductive by exposing Ms. Mitchell to ongoing increased health risks, and would unduly delay Ms. Mitchell from receiving meaningful mental health care that she finally embraced. Rather, a sentence of time-served or close to it, to be followed by strict conditions of supervised release, would be both reasonable and meaningful.

## II.  CLARIFICATIONS TO THE PRESENTENCE INVESTIGATION REPORT

Ms. Mitchell offers the following minor clarifications to the PSR. In addition to these few points, counsel notes that numerous medical issues and problems are noted in the PSR as "unverified" but are, in fact, corroborated by MCC medical records. The undersigned recently obtained those medical records and provided the same to Probation and the government.[1] Given

---

[1] The PSR notes that medical records had been requested but not received from the MCC by the time the report was submitted on September 19, 2023. (PSR, p. 17, ¶80).

that the MCC medical records are, presumably, already part of the Bureau of Prisons' files, counsel does not seek amendments to the PSR, particularly to change the "unverified" references to "verified," but instead trusts that the medical records will follow Ms. Mitchell, to the extent that additional imprisonment is imposed.

### A. PART A: THE OFFENSE
### Charge(s) and Conviction(s) (PSR, p. 5, ¶7)

The PSR states that Ms. Mitchell "is not involved in any programmatic activity." (PSR, p. 5, ¶7). Ms. Mitchell has, in fact, participated in programs at the MCC. She has been enrolled in a GED class and hopes to take the test prior to the October 25 sentencing hearing. She has participated in and completed other programs, including programs related to conflict resolution and a health class. Further details of those programs will be provided at the sentencing hearing. Ms. Mitchell's participation in these programs is commendable, particularly when considering her ongoing health difficulties, including hospitalization following a COVID-19 infection. Counsel requests that the line "She is not involved in any programmatic activity" be removed from the PSR.

### B. PART C: OFFENDER CHARACTERISTICS
### Personal and Family Data (PSR, p. 14, ¶60)

The PSR states that Ms. Mitchell was born in Chicago, Illinois. (PSR, p. 14, ¶60). She was born in Aurora, Illinois.

### III. POSITION ON THE ADVISORY SENTENCING GUIDELINE RANGE

Counsel concurs with Probation that Ms. Mitchell's criminal history category is II, which differs from what the parties agreed upon in the Plea Agreement, which was category I. (PSR, p. 12, ¶46; p. 22, ¶117). This disparity is based on Probation's identification of a 2018 shoplifting case from Ridgeland, Mississippi, when Ms. Mitchell received a sentence of five days, time-

considered served. (PSR, p. 11, ¶45). This case was not included in the Plea Agreement. The circumstances of that minor offense should persuade the Court to find that Ms. Mitchell's criminal history category II is overstated from a §3553(a) perspective.

Regardless, when combined with an offense level of 19, the criminal history category II yields an adjusted offense level of 33-41 months. (PSR, p. 22, ¶115).

## IV.  SENTENCING MEMORANDUM

### A.  Legal Standards

The Federal Sentencing Guidelines serve as a "starting point" and "initial benchmark" for determining a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007); *Pepper v. United States*, 562 U.S. 476 (2011); *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall*, 552 U.S. at 49); *United States v. Hill*, 645 F.3d 900, 905 (7th Cir. 2011). Under *Gall*, sentencing judges must "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. *Id.*, 552 U.S. at 49.

The Seventh Circuit has emphasized how "the Guidelines are, after all, guidelines that must be considered seriously and applied carefully. In the end, however, the defendant's sentence is the responsibility of the district judge, after careful consideration of all the relevant factors under 18 U.S.C. § 3553(a)." *United States v. Lopez*, 634 F.3d 948, 953-954 (7th Cir. 2011) (cleaned up). Focused consideration of the §3553(a) sentencing factors ensures that the sentencing decision is individualized, which it must be. *See Concepcion v. United States*, 142 S. Ct. 2389, 2399 (2022) (cleaned up) ("Indeed, it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique

4

study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

Individualized consideration of Ms. Mitchell necessarily requires the Court to impose a sentence that is "sufficient but not greater than necessary"—a standard also known as the "parsimony" clause that is the "overarching provision" of §3553(a). *Kimbrough*, 552 U.S. at 101. By its very terms, that provision instructs the Court to consider a sentence that is the least severe, *i.e.*, not greater than necessary. *See United States v. Santoya*, 493 F.Supp.2d 1075, 1077 (E.D. Wis. 2007) ("This is the so-called 'parsimony provision,' which requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public and rehabilitation of the defendant.").

**B.       Nature and Circumstances of the Offense—§3553(a)(1)**

In determining the sentence to be imposed, the Court must consider the "nature and circumstances of the offense." 18 U.S.C. §3553(a)(1). Ms. Mitchell readily acknowledges the serious nature of the offense conduct. The narcotics she helped her boyfriend sell were dangerous, and she deeply regrets her role, no matter how small, in the overall conspiracy. Ms. Mitchell gave a fulsome and truthful post-arrest interview and then participated in a "safety valve" proffer where she again truthfully discussed her role in the offense. (PSR, p. 6, ¶¶14, 17). This conduct reflects her acceptance of responsibility and acknowledgment of the seriousness of the offense conduct.

The PSR adequately describes the nature of the of the offense conduct. The co-conspirators took turns operating a phone that drug customers called when they wanted to buy drugs. It was, as noted in the PSR, akin to a "call-up narcotics delivery line." (PSR, p. 5, ¶9). Conspirators sold crack-cocaine, as well as heroin that contained detectable amounts of fentanyl. Conspirators would

keep small margins from the drug sales for themselves and return the bulk of the proceeds to the leaders who also supplied drugs to sell during shifts. (PSR, p. 5, ¶¶9-10).

Several important points must be made regarding Ms. Mitchell's unique role in the overall conspiracy. These points are made not to minimize her conduct, but to contextualize it. First, the PSR notes that three firearms were recovered from others. (PSR, p. 4, ¶3). However, there is absolutely no suggestion that Ms. Mitchell knew about these firearms or had any involvement in any kind of violence. Rightly so, the firearms do not factor into Ms. Mitchell's guidelines. Nor should they or any type of violence be considered as part of the nature and circumstances of the offense.

Second, while the conspiracy stretched from April 23, 2020 through September 1, 2020, Ms. Mitchell only participated in the conspiracy from August 11, 2020 through September 1, 2020. (*Compare* PSR, p. 5, ¶9 *with* PSR, p. 6, ¶13). Moreover, Ms. Mitchell truthfully explained to law enforcement in a post-arrest interview that she worked the telephone with her then boyfriend between six and ten times, which is even a smaller subset of time. (PSR, p. 6, ¶13). Ms. Mitchell accepts, for the purpose of the guidelines, the government's drug quantity calculations that are based on the 21-day period during which she helped her boyfriend sell drugs, *i.e.*, August 11, 2020 through September 1, 2020. (PSR, p. 6, ¶13; p. 7, ¶22). However, for the sake of argument, if the base offense level was calculated only on the 6 to 10 dates Ms. Mitchell sold drugs with her boyfriend, it would be level 24, not 26.[2]

Third, Ms. Mitchell participated in the offense only because of her relationship with her then boyfriend and codefendant. The PSR correctly characterizes this dynamic: "the defendant

---

[2] Using the government's per-diem calculations for the crack and heroin sold, the drug quantity for 6 days would be 193kg and the drug quantity for 10 days would be 321kg, each reflecting converted drug weight. Those figures fall between 100kg and 400kg, which is base offense level 24. U.S.S.G. §2D1.1(c)(8).

accompanied Jarvis Blair (her boyfriend at the time) when he worked the cellular telephone and assisted him with delivering narcotics." (PSR, p. 5, ¶11). Indeed, on August 11, 2020 when an undercover officer purchased heroin from Ms. Mitchell and Mr. Blair, it was Mr. Blair who answered the phone. (PSR, p. 6, ¶12). None of this is meant to diminish Ms. Mitchell's personal agency and her own decisions to participate in the offense conduct. But, if she had not been with Mr. Blair at the time, then she would not be before the Court now. She was also a fungible accessory for Mr. Blair, who dealt drugs without Ms. Mitchell. Indeed, on September 1, 2020, he was pulled over by Chicago Police who discovered the "drug phone" and packaged drugs for sale in the car. Two other people, not Ms. Mitchell, were with Mr. Blair at the time.[3]

Based on the totality of these circumstances, the government correctly saw Ms. Mitchell as a minor participant in the offense conduct pursuant to U.S.S.G. §3B1.2(b). Probation concurs with that view and reduces Ms. Mitchell's adjusted offense level by two points. (PSR, p. 7, ¶25). While seeing Ms. Mitchell's role as "minor" is correct, the full extent of the mitigating circumstances is not limited solely to the two-point guideline reduction. Rather, as discussed below in connection with Ms. Mitchell's history and characteristics, this relationship was yet another instance where Ms. Mitchell was used and allowed herself to be devalued due to her own diminished sense of self-worth. It was that sad and tragic history that contributed directly to her poor decision-making that led her to assist her boyfriend in the conspiracy.

### C. <u>History and Characteristics of Defendant—§3553(a)(1)</u>

In determining the sentence to be imposed, the Court must also consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). While the PSR provides a detailed overview of Ms. Brooks's history and characteristics (PSR, pp. 14-21, ¶¶58-109), to ensure that

---

[3] For further reference to this incident, Mr. Blair challenged this September 1, 2020, traffic stop through a pretrial motion to suppress. Dkt. #341.

the Court's sentence "fit[s] the offender and not merely the crime" (*Pepper*, 131 S.Ct. at 1240) it is necessary to expand on certain points.

### 1. Ms. Mitchell's Chaotic Upbringing that Included Drug Abuse, Sexual Abuse, and Violence Left Lasting Scars.

Ms. Mitchell childhood was marked by near-constant instability and abuse. Both her parents were addicts and she had no positive role models, little to no support, and experienced horrible abuse and trauma. Her biological parents separated when she was just two years old. (PSR, p. 14, ¶62). According to publicly available Illinois Department of Corrections records, her father went to prison in the early 1990s after being convicted of aggravated battery and murder. (PSR, p. 15, ¶60). He returned to prison in 2006 for another aggravated battery conviction, which was followed by two more aggravated battery convictions in 2007 and 2009, and then finally an aggravated domestic battery conviction in 2016, for which he is still in prison. When Ms. Mitchell's father was not in prison, he posed a threat to others. At some point between his prison stints, he attempted to have sexual intercourse with one of his daughters (Ms. Mitchell's half-sister). (PSR, p. 15, ¶62). Substance abuse was also a problem. Ms. Mitchell recalled how he abused "a lot of everything" and was also an alcoholic. (PSR, p. 15, ¶63).

Ms. Mitchell's mother admittedly struggled with substance abuse issues, which led Ms. Mitchell to spend the "majority" of her early years with her aunt in Aurora, Illinois. (PSR, p. 15, ¶¶63-64). Ms. Mitchell would live with her mother when she was sober, including in sober living homes, but would return to her aunt when her mother relapsed. (PSR, p. 15, ¶63). Ms. Mitchell deeply regrets not having a real mother/daughter relationship. She still feels her mother's failure to care for her was "emotional abuse." (PSR, p. 15, ¶65). No doubt, having two addicts as parents (PSR, p. 20, ¶99)—and one who was also a sexual abuser and violent offender—left Ms. Mitchell desperate for positive attention. It also exposed her to substance abuse problems, which she had at

8

a very early age, including drinking to intoxication on a regular basis from age 13 to 32. (PSR, p. 20, ¶95). This disjointed and difficult childhood disrupted any hope for normalcy. It impaired her education, as she never even finished the 9th grade. (PSR, p. 20, ¶101). These troubling formative experiences also made her vulnerable to being used by others who pretended to offer affection.

Echoing these points, and with the benefit of hindsight, Ms. Mitchell's mother now sees how Ms. Mitchell "didn't value herself" and instead "surrounded herself with people who did not value her." (PSR, p 15, ¶67). Working in reverse chronological order, in 2017, Ms. Mitchell met Mr. Blair, her co-defendant. (PSR, p. 15, ¶68). The PSR describes very unfortunate conduct that Ms. Mitchell engaged in at Mr. Blair's urging in 2019 so she could earn money for the couple when they lived in Memphis together. (PSR, p. 18, ¶85). The PSR notes that Ms. Mitchell "gave him the money she earned to pay for their hotel and food." (*Id.*).

Prior to that, when she was 15, Ms. Mitchell was in a relationship with a 21-year-old who used to "beat [her] ass." (PSR, p. 18, ¶83). The two were sexually active, which was statutory rape, as Ms. Mitchell was unable to consent by law. (PSR, p. 18, ¶83). Ms. Mitchell's history of sexual abuse unfortunately predates that "relationship." When she was five or six years old, she was molested by a teenager who was her uncle's wife's son. (PSR, p. 17, ¶81). This sexual assault occurred on more than 10 separate occasions. (*Id.*). Both the young male *and* Ms. Mitchell were "whoop[ed]" for this, even though Ms. Mitchell was a child victim. It is also notable that this abuse occurred when Ms. Mitchell lived with extended family because her mother was using drugs. Ms. Mitchell's mother noted that she did not learn of this abuse until later, but that it caused a "lot of struggles" for her daughter. (PSR, p. 15, ¶64). Ms. Mitchell never received mental health treatment for any of this abuse. (PSR, p. 18, ¶81).

### 2. Ms. Mitchell's Long-Term and Untreated Mental Health Problems.

Given the abuse and tumult that marred Ms. Mitchell's childhood, it is no surprise that she suffers from deep-seated and untreated mental health problems. Ms. Mitchell's history of mental health problems is profoundly mitigating, especially because it contextualizes her poor decision-making and repeated abusive relationships. While she has not received targeted mental health treatment and admittedly did not take advantage of therapy at the outset of the case as best she could, she did meet a therapist she trusted and made significant progress shortly before she was incarcerated. (PSR, p. 18, ¶88). Engaging in intense mental health treatment is essential for Ms. Mitchell's health and personal safety, and it will also help her lead a law-abiding life in the future.

Ms. Mitchell has a verified diagnoses of major depressive disorder (severe) and panic disorder. (PSR, p. 19, ¶¶87, 88). She is currently prescribed Duloxetine (Cymbalta) per MCC medical records. Ms. Mitchell's mother feels that she and others failed in not getting treatment she needed, even though she tried to do so. At just 14 years old, Ms. Mitchell was hospitalized at Hartgrove Hospital in Chicago—a facility designed to assist adolescents and children with their mental health needs. (PSR, p. 18, ¶82). She continued to participate in therapy, including inpatient treatment at Hartgrove. But her mother told Probation, "there were a lot of issues we didn't deal with properly. Maybe Ms. Mitchell would have made wiser decisions if handled differently." (PSR, p. 18, ¶82) (cleaned up). These observations correctly link Ms. Mitchell's traumas, mental health conditions, and poor decisions together.

Ms. Mitchell's history of suicidal ideations and suicide attempts highlight the severity of her mental health issues. She first had such thoughts when she was 14 or 15 years old. (PSR, p. 18, ¶84). Her mother confirms that she had suicidal ideations between 2007 and 2010 when she was between 22 and 25 years old. Some of these episodes required hospitalization. (PSR, p. 18,

¶84). Ms. Mitchell recalled another time when she thought of killing herself in 2015 when she was 30 years old. (*Id*.). More recently, while on pretrial release and shortly before her detention in June 2023, Ms. Mitchell again had suicidal ideations. (PSR, p. 18, ¶86). But this time she contacted her therapist and was able to "talk it through." (*Id*.). These suicidal thoughts relate directly to her belief that nobody cares about her or loves her. (*Id*.). The depression causes her to not "want to be here no more." (*Id*.).

Ms. Mitchell's desire for treatment shows that she wants to break the cycle that has trapped her. She bluntly told Probation that she "didn't realize how damaged she was." (PSR, p. 19, ¶89). She sincerely wants to continue the therapy to try and fix that damage, particularly with the therapist who talked her through her most recent severe depressive episode. Unfortunately, Ms. Mitchell has not been able to receive meaningful mental health care at the MCC, and desperately wants to reconnect with this therapist. (PSR, p. 19, ¶89) ("She expressed a desire to return to her same counselor at Presence in Chicago."). This therapist confirmed that Ms. Mitchell "requested to work on issues related to the depressive episodes she experienced." (PSR, p. 19, ¶88). Her mother also recognizes how Ms. Mitchell may have turned a corner just before it was too late, and that she hopes she can "get the help she was getting" and continue to "focus on her mental health treatment." (PSR, p. 15, ¶67). Ms. Mitchell is grateful that she received mental health counseling to start getting the help she needs, and regrets not being more active in this therapy at the outset of her case. (PSR, p. 19, ¶89). She made some important realizations through therapy. She now understands that she would always "leech onto" anyone that showed her affection and do "whatever to make them happy." (PSR, p. 19, ¶89). Now she realizes that she must make herself happy, and not judge her own happiness "by making other people happy." (*Id*.). These key insights bode well for Ms. Mitchell and her future, provided she continues with therapy.

11

### 3. Ms. Mitchell's Precarious Physical Health Conditions.

Ms. Mitchell's mental health problems are matched by her serious physical health problems. Those physical health problems are listed in the PSR. (PSR, pp. 16-17, ¶¶74-79). They include systolic heart failure, Type II diabetes, morbid obesity, obstructive sleep apnea, and primary hypertension. MCC medical records confirm these diagnoses. She battled these health issues throughout pretrial release, including a hospitalization in December 2022 for heart failure. (PSR, p. 17, ¶76). She was also hospitalized in late May 2023, shortly before being detained, for neuropathic pain in her legs. (PSR, p. 17, ¶77). Ms. Mitchell is also prescribed a long list of medications, as noted in MCC medical records that the undersigned has provided to Probation and the government.[4]

This constellation of serious physical health issues has posed immense challenges for Ms. Mitchell at the MCC. She can barely walk 10 feet without experienced labored breathing. She still suffers from neuropathic leg pain but does not have access to the ameliorative medication that she was prescribed while on pretrial release. She suffers through this pain daily. Indeed, the sole disciplinary issue noted in the PSR—"failing to stand count" (PSR, p. 5, ¶7)—was the direct result of not being physically able to walk without pain, and thus not moving fast enough for MCC staff. She pled her case to MCC staff but received no adjustment to the ticket, despite the documented medical history that supported her case.

Ms. Mitchell's health conditions have worsened while at the MCC. She was infected by the COVID-19 virus on August 20, 2023. She sought help from MCC staff after experiencing severe breathing problems and discomfort. One MCC report states as follows: "On August 20,

---

[4] The PSR notes that Ms. Mitchell reported that she "is prescribed" a number of medications. (PSR, p. 17, ¶75). To be clear, those medications were all prescribed to Ms. Mitchell while she was on pretrial release and are confirmed by medical records the undersigned obtained. Following her detention, the MCC medical staff changed some of her medications and discontinued others that were non-formulary.

2023, at approximately 9:30am, Inmate Mitchell (15739-509) c/o chest pain with an onset of 2-3 hours, that was worse on exertion. Patient described pain as a 'punch' and rated it a 8, 1-10. Patient had audible wheezes in the bilateral upper lung fields, appeared weak, diaphoretic and SOB; as she utilized her accessory muscles to breathe." Ms. Mitchell was then taken to an outside hospital and diagnosed with COVID-19 after testing. This was a breakthrough infection, as Ms. Mitchell was vaccinated. Ms. Mitchell was placed in isolation at the MCC for one week, which was extremely difficult from a psychological perspective. She could not contact friends and loved ones, and even attorney calls with the undersigned could not go forward while she was on isolation. This arduous experience following her COVID-19 infection highlights how even the four months that Ms. Mitchell has been in custody have no doubt been "harder time" for her compared to other inmates due to her physical and mental health problems.

### 4. Ms. Mitchell's Pretrial Release Issues.

The Court may find Ms. Mitchell's less than admirable track record on pretrial release concerning. Indeed, Probation notes that it would have recommended a sentence even farther below the advisory guidelines had Ms. Mitchell not racked up so many violations. Ms. Mitchell is ashamed and remorseful of her conduct as she is now paying the price after her bond was revoked. Without diminishing her acceptance of responsibility for not complying with all her bond conditions, it must be noted that many of her location monitoring problems were connected to other issues related to her poverty, lack of mobility, and dependence on others for transportation. And while she was written-up for missing urinalysis tests, she never once tested dirty over the course of 46 tests. Her missed appointments were not due to using drugs. Indeed, Ms. Mitchell's abstinence from using marijuana and other drugs should be commended given her history of drug use, including up to the time of her arrest. (PSR, p. 19, ¶94). Ms. Mitchell also suffered severe

trauma during pretrial release when her younger brother was murdered, which affected her mental state. (PSR, p. 14, ¶61). Nevertheless, Ms. Mitchell is disappointed in her own conduct and accepts that she could have done better. She looks forward to proving that she can do better while on supervised release.

### D. A Sentence Involving No to Minimal Additional Incarceration Would Comply with the Factors Set Forth in §3553(a)(2).

In fashioning its sentence, the Court also takes into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence (general deterrence) and protect the public from further crimes of defendant (specific deterrence); and to provide the defendant with needed educational or vocational training, medical care, or correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2)(A)-(D).

### 1. Deterrence Concerns are Served by a Sentence Involving No to Minimal Additional Incarceration.

Starting with the issue of deterrence, general deterrence "is premised on an assumption that imposing an appropriate sentence will dissuade others from committing similar crimes," while specific deterrence focuses on "the prevention of future harm to the public by the defendant, without reference to the mechanism for achieving it." *United States v. Henshaw*, No. 16-cr-30049-SMY, 2018 U.S. Dist. LEXIS 111052, at *19-21 (S.D. Ill. July 3, 2018).

Counsel recognizes the importance of general deterrence as an abstract concept. Yet, as the Court is no doubt aware, many have observed that it is the certainty of punishment rather than the severity of punishment that has a greater impact on deterrence. *See, e.g.*, Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, p. 1, The Sentencing Project, Nov. 2010; *United States v. Courtney*, 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M.

14

2014) (citing studies). ("An avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world."); National Institute of Justice, *Five Things About Deterrence* ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment.") (available at: https://bit.ly/3Sgcstw) (last visited Oct. 9, 2023).

Setting aside the debate between certainty versus severity, it is often difficult (if not impossible) to measure how much deterrence will result from a particular sentence. Ms. Mitchell's arrest and now incarceration will no doubt scare those who could be deterred from committing a similar offense. A lengthy term of imprisonment is not necessary to further general deterrence. Put another way, incarceration will not deter those who are not already deterred by notice of Ms. Mitchell's arrest, prosecution, and conviction.

As to the issue of specific deterrence, counsel submits that intensive mental health treatment will be the key to Ms. Mitchell's success and minimize her risk for recidivism. She lands in Criminal History Category II based on two cases, a 2012 forgery case for which she received probation, and a 2018 shoplifting case for which she received five days of jail time. (PSR, p. 11, ¶¶43, 45). As to the 2018 case that was not included in the Plea Agreement, Ms. Mitchell has informed undersigned counsel that she was jailed in Ridgeland, Mississippi on a bond that she could not afford and "pled out" to the offense simply because doing so allowed her to get out of jail. Had she been able to post bond, she would have fought the case. This minor shoplifting case boosts Ms. Mitchell into criminal history category II, which puts her in the same category as someone with a 3-point violent offense. In many ways Ms. Mitchell's criminal history is overstated

and does not justify anywhere close to a guideline sentence to address specific deterrence concerns.[5]

Ms. Mitchell's difficult experience in custody at the MCC has already had a deterrent effect. The past four months has been the longest period she has served in custody by far. It has been arduous beyond what other inmates experience because of her mental health and physical health problems, including her hospitalization after her COVID-19 infection. From a deterrence perspective, no further imprisonment is necessary to show Ms. Mitchell what awaits her should she violate the law in the future.

> **2. A Sentence That Involves No to Minimal Additional Incarceration Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.**

Under §3553(a)(2), the Court must also address whether the sentence provides the "needed educational or vocational training, medical care, or correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). A lengthy term of imprisonment is not necessary to address these concerns. Ms. Mitchell is struggling with her medical and more importantly experiencing a lack of meaningful mental health care while at the MCC. She desperately seeks to reconnect with her therapist or someone of equal caliber to continue addressing her past traumas and building a path forward. Keeping Ms. Mitchell in custody will not ensure the "most effective" medical and mental health treatment.

With regard to reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment, factors to be weighed under 18 U.S.C. § 3553(a)(2)(A), counsel

---

[5] Ms. Mitchell only has one narcotics-related conviction in her background, and that is nearly 20 years old. (PSR, p. 9, ¶40). The PSR also reflects an aggravated battery case from 2003 when Ms. Mitchell was 18. (PSR, p. 9, ¶39). The PSR describes the case as involving a "stabb[ing]," which likely exaggerates what actually happened because, according to the PSR, the injuries only involved a "minor laceration" and the sentence ultimately involved six days in jail and court supervision, which is not even a conviction under Illinois law. Put simply, Ms. Mitchell's criminal history should not pose recidivism concerns.

acknowledges the need for a stern sanction. The offense was serious, but there are also other defendants whose roles were far more serious than that of Ms. Mitchell and a message will certainly be sent for any sentence imposed for those defendants. Her unique role, and the reasons why she was involved in the conspiracy in the first place relate more to her mental health needs and involvement in abusive relationships than to criminality. Even after reducing her guidelines with the appropriate "minor role" adjustment, a guideline sentence would be too severe and would be *unjust* punishment.

It is for that reason that counsel submits that a short term of imprisonment, even time-served, could be imposed, without denigrating the law and the need to impose just punishment. Along those lines, the Supreme Court has emphasized that a sentence of probation on a felony offense is a punitive sentence that carries real consequences and significant restrictions on liberty. *Gall*, 552 U.S. at 47-48. The Court specifically acknowledged that a sentence of probation constitutes a "substantial restriction of freedom" and that it is "not granted out of a spirit of leniency" that "[lets] an offender off easy." *Gall* 552 U.S. at 48, fn.4 (quotation omitted); *see also United States v. Brady*, 2004 U.S. Dist. LEXIS 589, *28, 2004 WL 86414 (E.D.N.Y. Jan. 20, 2004) (quoting U.S. Sentencing Guidelines Manual Ch. 5, pt. B, introductory cmt.) ("probation is also a punitive measure, and 'may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant.'").

     **E.**     **A Sentence Involving Minimal Incarceration
Would Satisfy §3553(a)(6).**

A sentence with minimal incarceration would also satisfy the mandate of 18 U.S.C. §3553(a)(6), which directs the court to "avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct." Seventeen (17) defendants are charged in this Indictment. To date, only three other defendants have resolved their cases. Enrique Hollins was sentenced to time-served on May 24, 2023. (Dkt. ##617, 622). Based on the docket entries, it appears that Mr. Hollins' guideline range was 87-108 months and the "time-served" sentence amounted to approximately 30 months in custody, which is about 35% of the low-end of the guidelines. Defendant Oshay Kelley, who was initially diverted to the SOAR program, received a sentence of 30 days of home confinement, time-considered served on April 7, 2023. (Dkt. ##598, 601). Kelley's guideline range was 6-12 months, as stated in the plea agreement. (Dkt. #273). Defendant Ina Williams has also been diverted to the SOAR program. According to her plea agreement, her offense conduct involved a greater quantity of narcotics than Ms. Mitchell's, resulting in a guideline range somewhere between 37 and 57 months. (Dkt. #672). While these three cases present a small sample, they show that sentencing Ms. Mitchell anywhere close to the guidelines would create, rather than avoid, a sentencing disparity.

## V.    <u>SENTENCING RECOMMENDATION</u>

For the foregoing reasons, counsel respectfully submits that the Court should sentence Ms. Mitchell to time-served. But should the Court deem a sentence of incarceration beyond the four months that Ms. Mitchell has already served is necessary, then the term imposed should not be excessive and most certainly should not exceed 1 year and 1 day. Such a sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing in this unique case with the overwhelming mitigation that has been presented.

## VI.    POSITION ON SUPERVISED RELEASE CONDITIONS

Counsel concurs with Probation's proposed conditions of supervised release except for the specific conditions noted below.

*Special Conditions No. 5, 8, and 12*: These conditions each relate to financial reporting requirements, including not opening new lines of credit without authorization, filing accurate income taxes, and repaying the DEA $50 in buy money. Counsel anticipates that Ms. Mitchell's family will have the requisite funds to pay at the time of her sentencing. In that event, counsel believes these conditions are unnecessary and should not be included.

*Special Condition No. 13*:  Counsel objects to the proposed special condition that vests the probation officer with sole discretion to determine if Ms. Mitchell "pose[s] a risk to another person" and then authorizing the probation officer to require him "to tell the person about the risk." This condition would also require Ms. Mitchell to tell others about his "record of arrests and convictions and substance use." It would also allow the probation officer to contact the person to confirm that Ms. Mitchell has told them "about the risk." This condition should not be imposed. "Risk," the lynchpin of the condition, is hopelessly vague, *i.e.*, what is a "risk" and what standards guide the probation officer to be the sole arbiter of determining it? The condition would also interfere with Ms. Mitchell's meaningful efforts at rehabilitation, such as securing gainful employment for which he will already have numerous obstacles give her medical conditions and lack of education and work history. At bottom, there are other meaningful steps that can be taken to mitigate concerns that Ms. Mitchell's reintegration into society might pose, particularly with drug testing and meaningful counseling.

Respectfully submitted,

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com

## CERTIFICATE OF SERVICE

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing was served on October 10, 2023, in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P.5., LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**

**LAW OFFICE OF JOSHUA G. HERMAN**
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
Tel: (312) 909-0434
jherman@joshhermanlaw.com