IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20 CR 577-17 |
| | ) | Hon. Elaine E. Bucklo |
| DOROTHY WILLIAMS, | ) | |
|     Defendant. | ) | |

**DEFENDANT'S POSITION PAPER ON SENTENCING**

Defendant, DOROTHY WILLIAMS, by and through her attorney, LISA L. WOOD, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18 U.S.C. §3553(a), as well as the Sixth Amendment to the Constitution of the United States and the Supreme Court's opinion in *United States v. Booker,* 543 U.S. 220 (2005), respectfully submits the following sentencing memorandum in advance of her sentencing hearing, which is currently set for March 15, 2024. It is respectfully requested that Ms. Williams be sentenced to one day time-served, and a term of supervised release with substance abuse and mental health treatment.

    **I.**    **Introduction**

The Court is no doubt familiar with the wide sentencing discretion provided under 18 U.S.C. §3553(a) since the Supreme Court decided *United States v. Booker,* 543 U.S. 220 (2005), and reiterated that discretion in cases such as *United States v. Rita,* 551 U.S. 338 (2007), and *Gall v. United States,* 552 U.S. 38 (2007). The statutory sentencing factors found in §3553(a) provide the Court with the framework upon which to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing by taking into account,

among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to satisfy the purposes of sentencing.

II.     **Procedural Posture**

On December 20, 2023, Dorothy Williams entered into a plea declaration. She agreed to plead guilty to Count 1 of the superseding indictment, which charged her and several co-defendants with conspiracy to possess with intent to distribute and distribute controlled substances, in violation of 21 U.S.C. §846. PSR at 5, ¶2.

Pursuant to the plea declaration, Ms. Williams agreed to the facts provided in the written factual basis and admitted that, on August 6, 2020, she conspired with co-defendant Paul Wilkins (her now-husband), and others, to distribute controlled substances. She further admitted that on August 6, 2020, she and Wilkins sold narcotics to an undercover law enforcement officer (UC-13) posing as a drug customer. Specifically, Wilkins coordinated a meeting location with UC-13 over the phone. Then Ms. Williams and Wilkins drove to meet UC-13 in a parking lot. Ms. Williams exited Wilkins car, entered UC-13's car, and provided UC-13 with five bags of heroin and five bags of cocaine base in exchange for $100. Ms. Williams also admitted that she participated in two other narcotic sales with Wilkins to undercover officers on August 6, 2020. The total amount of narcotics she and Wilkins conspired to sell, and sold, on August 6, 2020, was 4.14 grams of fentanyl laced heroin and 0.736 grams of cocaine base. PSR at 6, ¶¶10-12.

III.    **Objection to the PSR: Base Offense Level**

The government alleges, and the PSR agrees, that Ms. Williams was involved in the conspiracy between approximately August 6, 2020, and September 1, 2020, and is therefore accountable for reasonably foreseeable acts of other conspiracy participants during that time. The government further alleges that during that 27-day period, the average amount of narcotics sold

2

by the conspiracy each day was 8.35 grams of fentanyl laced heroin, and 3.22 grams of cocaine base. Gov. Vers. 4. Accordingly, it is the government and the PSR's position that Ms. Williams is responsible for a total of 225.45 grams of fentanyl-laced heroin, and 86.94 grams of cocaine base, resulting in a base offense level of 28. PSR at 8-9, ¶¶20-24; Gov. Vers. 4. Ms. Williams objects to this conclusion.

Ms. Williams was involved in three controlled buys on August 6, 2020. The total amount of drugs sold during these three sales was 4.14 grams of fentanyl laced heroin and 0.736 grams of cocaine base. The only other evidence of her involvement in the conspiracy is (1) a report stating that Ms. Williams was seen in a car with Wilkins on August 24, 2020, when *Wilkins* distributed 2.0 *gross* grams of *suspect* fentanyl-laced heroin to an individual; and (2) Ms. Williams' post-arrest statement, wherein she stated that "she had never sold narcotics from Target Phone 9 alone," only with Wilkins. PSR at 8, ¶22; Gov. Vers. Ex. B. She further stated that "Wilkins would ask [her] to come with him when he worked Target Phone 9 to be a look out for police and stick-up crews." Gov. Vers. Ex. B. Finally, she admitted knowledge of some of the other members of the conspiracy and their roles in the conspiracy. *Id*. For example, she stated Johnnie Grant provided the phone and narcotics to Wilkins, and that "Dex" managed the phone before Grant. *Id*.

The Guidelines define relevant conduct as "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction..." U.S.S.G. § 1B1.3(a)(1)(B). Therefore, whether a defendant "is liable for the sale of illegal drugs by other members of the conspiracy that [she] had joined depends not only on whether the sale quantity was foreseeable to [her]…but also on whether [she] joined with those other conspirators in a joint undertaking of which the making of

3

those sales was an objective, or had agreed to join in such an undertaking." *United States v. Davison*, 761 F.3d 683, 685-86 (7th Cir. 2014).

Here, while Ms. Williams undoubtedly conspired with Wilkins to distribute drugs on August 6, 2020, and perhaps on August 24, 2020, this does not mean that the scope of her conspiratorial agreement encompassed the drug sales made as part of the broader Bryant DTO conspiracy between August 6, 2020, and September 1, 2020. See *United States v. Hollins*, 498 F.3d 622, 630 (7th Cir. 2007) (Reasonable foreseeability "refers to the scope of the agreement that [a defendant] entered into when [s]he joined the conspiracy, not merely the drugs [s]he may have known about."). Aside from the three August 6, 2020, sales with Wilkins, and the fact that she was present in the car with Wilkins on August 24, 2020, when *he* distributed a personal use quantity of suspect narcotics, there is no evidence that Ms. Williams did or agreed to do anything to promote sales by the other defendants, even if she knew they were taking place. See *Davison*, 761 F.3d at 686 (holding that in such a scenario, such sales are not relevant conduct). There is no evidence, for example, that Ms. Williams served as a lookout on dates other than August 6, 2020, and August 24, 2020. And there is certainly no evidence that she "worked the phone" – in fact, Ms. Williams was *never* intercepted on Target Phone 9.

Under Seventh Circuit precedent, "A defendant's long tenure and critical role in an organization support the finding that the defendant can be held accountable for the aggregate amount of drugs attributable to all the conspirators." *United States v. Gonzales*, 765 F.3d 732, 739 (7th Cir. 2014). Conversely, a defendant's brief, inconsistent involvement in a conspiracy is a compelling reason that she should not be held accountable for the aggregate amount of drugs. *United States v. Mojica*, 984 F.2d 1426, 1446 (7th Cir. 1993). Here, Ms. Williams' limited participation in the conspiracy on August 6, 2020, and possibly on August 24, 2020, does not

raise an inference that totality of the Bryant DTO drug sales between August 6, 2020, and September 1, 2020, were reasonably foreseeable to her or within the scope of the criminal activity she agreed to undertake.

Accordingly, Ms. Williams objects to the PSR's conclusion that the base offense level is 28. Instead, it is Ms. Williams' position that she is accountable for 6.14 grams of fentanyl-laced heroin, and 0.736 grams of cocaine base – the total amount of narcotics involved in the August 6, 2020, and August 24, 2020, incidents. This equates to a converted drug weight of 17.978 kg and a base offense level of 14.

  **IV. Guideline Range & Crack-to-Powder Disparity**

Depending on how the Court rules on the objection above, the base offense level is either 28 or 14. The defense, however, supports eliminating the powder-to-crack sentencing disparity and would therefore advocate for a sentencing guideline range consistent with the Guidelines for powder cocaine rather than crack cocaine. The court may, consistent with the law and current sentencing framework, consider whether the powder-to-crack disparity is warranted in assessing the §3553(a) factors at sentencing. If crack cocaine was treated as powder cocaine under the Sentencing Guidelines Manual currently in effect, and the defendant's objection above is sustained, then the base offense level would remain 14, pursuant to Guideline § 2D1.l(a)(5) and (c)(13) because the amount of converted drug weight is still between 10 and 20 kg. If crack cocaine was treated as powder cocaine, and the defendant's objection is overruled, then the base offense level would be 26, pursuant to Guideline§ 2D1.l(a)(5) and (c)(7), because the amount of converted drug weight is 581.013 kg. Accounting for a two-level reduction for a minor role adjustment, and a two- or three-level reduction for acceptance of responsibility, and combined

5

with a Criminal History Category of III, this yields an advisory guideline range of 10-16 months (defense position) or 46-57 months (government position), respectively.

For the reasons stated below, a sentence within either guideline range would be unreasonable. Instead, a noncustodial sentence is requested.

**V.   Ms. Williams' History and Characteristics Demonstrate that a Noncustodial Sentence is Appropriate.**

To achieve the goals of sentencing, this Court must "'consider every convicted person as an individual,'" *Pepper v. United States*, 562 U.S. 476, 487 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)), and must fashion a punishment that "fit[s] the offender and not merely the crime." *Id.* When Ms. Williams' history and characteristics are examined, it is clear that a noncustodial sentence is appropriate to achieve justice in this case.

   a. *Ms. Williams' Long History of Substance Abuse and its Relation to the Offense*

To understand Ms. Williams' involvement in this crime, it is necessary to consider her personal history. Ms. Williams is remorseful for her behavior. It is likely, however, that her own history of instability, trauma and substance abuse contributed to this offense, and to her historical criminal conduct.

Ms. Williams was born in 1962 to Sarah Little and Napoleon Williams. PSR at 18, ¶70. She was raised primarily by her mother, who also had six other children, and who worked two jobs to support her family. PSR at 18, ¶71. Ms. Williams saw her father on the weekends and he provided her mother with financial support. *Id.* Ms. Williams' early years were relatively stable, and Ms. Williams described her childhood as good. *Id.*

As a teen, Ms. Williams began to rebel. To keep her children out of trouble, Ms. Williams' mother would not let Ms. Williams or her siblings go outside the home. PSR at 19,

¶72. When Ms. Williams, however, saw her friends going to parties, she too wanted to go, and as a result she frequently ran away from home. *Id*.

Around the same time, Ms. Williams also became aware of the sexual abuse of her siblings by her own father. PSR at 19, ¶73. Specifically, when her mother was working at night, Ms. Williams' father would come over every other night, pull Ms. Williams' two oldest sisters out of bed, and molest them. *Id*. When Ms. Williams' oldest sister reported the abuse to her mother, her mother called her a liar and sent Ms. Williams' sister to live with her own father. *Id*.

Ms. Williams also witnessed various men physically abuse her mother over the years.[1] PSR at 19, ¶¶73-74. This culminated when Ms. Williams was 18 and pregnant, and she witnessed her stepfather beating her mother. PSR at 19, ¶74. When she confronted her stepfather, he slapped Ms. Williams. *Id*. Ms. Williams called the police and pressed charges. *Id*. As a result, she was kicked out of the house shortly after giving birth, when her child was one month old. *Id*.

Ms. Williams' early delinquency manifested in the abuse of numerous substances. She used marijuana daily starting at age thirteen and continuing until her thirties. At fourteen, she began abusing alcohol, drinking to the point of intoxication every day until she was sixteen. PSR at 22, ¶92. At eighteen, she began abusing cocaine and heroin. *Id*. She used cocaine daily until her thirties and has used heroin on a near-daily basis her entire life, up until the present. *Id*.

It is well-known that adolescence is a period of significant neuromaturation, and the prefrontal cortex develops enhanced ability to execute such tasks as planning, integrating

---

[1] Ms. Williams, too, experienced physical abuse at the hands of a romantic partner. *See* PSR at 20, ¶81 ("She recalled that [her former partner] threw hot water on her, cut her face, and permanently damaged her lip. The defendant added that she went to the hospital following the abuse, usually twice a month. The defendant conveyed that [the former partner] was arrested and she ultimately went to a shelter to protect herself and her children.")

information, abstract thinking, problem solving, judgment, and reasoning. Donald W. Ziegler, et al., The neurocognitive effects of alcohol on adolescents and college students, 40 Preventative Medicine 23 (2005). "Because the adolescent brain undergoes dynamic changes, it may be more susceptible to damage from alcohol [and drugs] than the relatively stable adult brain." *Id*. at 26. There is evidence that substance abuse causes differential brain damage and more severe neurodegeneration in adolescent brains. *Id.* at 28.

      A review of Ms. Williams' PSR with these statistics in mind suggest that her chaotic home life was a seriously disruptive factor in her life. While Ms. Williams takes full responsibility for the choices she has made in her life, her involvement in the criminal justice system may be at least partially attributable to the trauma she experienced as a youth and her substance abuse. Indeed, Ms. Williams' criminal history, all of which is nonviolent, consists primarily of the types of offenses committed by those trying support their addictions: theft, drug possession, and prostitution.

      b.   *Treatment, Rather than Incarceration, is Best Suited to Achieve Deterrence*

      Section 3553(a)(2)(D) requires that this Court consider Ms. Williams' need for treatment in determining her sentence. As discussed, Ms. Williams has struggled with severe substance abuse throughout her life. Various sources of information cited in the PSR also indicate that Ms. Williams is in need of mental health treatment for depression. A sentence which allows Ms. Williams to address these issues, which undoubtedly played a role in her commission of the offense, would work to decrease recidivism.

      Importantly, Ms. Williams stands the best chance at actually receiving much-needed treatment in a non-custodial setting. The likelihood that Ms. Williams will receive the mental health care she needs within the Bureau of Prisons ("BOP") appears low. For years, the BOP has

been criticized for the lack of adequate mental health treatment available for its inmates. In May 2014, the BOP issued a new mental health policy intended to enhance the treatment of inmates with mental illness. BOP Program Statement 53016 (May 2014). However, since that time, the BOP has not provided enough resources (including mental health staff) to implement the policy's mandate, including "evidence-based practices for the treatment and care of mentally ill inmates." *Id*.; Office of the Inspector General, Department of Justice, "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness," Evaluations and Inspections Report 17-05 (July 2017). In 2017, the Chief Psychologist within the BOP lamented "that the new policy has great intentions, but 'there are just not enough bodies to carry out the policy.'" *Id.* at 41; see also Beth Reinhard, Trump Seeks Cuts in Federal Prison Jobs, THE WALL STREET JOURNAL (June 13, 2017) available: https://www.wsj.com/articles/trump-seeks-cuts-in-federal-prison-jobs-1497390682 (discussing administration's call for a 14% reduction in prison jobs). Ultimately, in 2015 and 2016, the number of inmates receiving regular mental health treatment dropped roughly 30%. *Id*. at 37.

With regard to substance abuse treatment, Ms. Williams has struggled with opiate addiction for more than thirty years. Any treatment plan would wisely include the use of medication such as methadone or buprenorphine. While the BOP has access to both medications, "bureaucratic inertia and outdated thinking about addiction treatment" has led to only a fraction of eligible inmates actually being treated with them. Beth Scwartzapfel, "These Meds Prevent Overdoses. Few Federal Prisoners Are Getting Them" The Marshall Project (Aug. 10, 2021) available: https://www.themarshallproject.org/2021/08/10/these-meds-prevent-overdoses-few-federal-prisoners-are-getting-them. In 2021, for example, "less than 2% of the more than 15,000 people the [BOP] itself estimated were eligible" for medication-assisted treatment actually

received medication to treat opioid use disorder. *Id*. In contrast, methadone is widely available outside of prison, and Ms. Williams recently enrolled herself in a methadone program near her home. While she does not deny that she has had a difficult time abstaining from opiate usage during the pendency of this case, even with the assistance of medication, she believes she stands the best chance of staying clean if she is allowed to utilize these life-saving medications.

    c. *Ms. Williams' Precarious Health Justifies a Noncustodial Sentence*

Ms. Williams' numerous and life-threatening health conditions, in conjunction with her extremely limited role in the conspiracy, justify a noncustodial sentence. Medical records reflect that Ms. Williams suffers from the following medical conditions, among others: restrictive/obstructive lung disease, chronic hypercapnia, heart failure, hypertension, a history of pulmonary embolisms complicated by epistaxis requiring transfusion, microcytic anemia, cirrhosis of the liver, obstructive sleep apnea, prediabetes, opioid use disorder, lumbar spondylosis with myelopathy, chondromalacia of the patella, and reflex sympathetic dystrophy of the upper limb. PSR at 21, ¶¶86, 88. Ms. Williams takes 11 medications each day and requires supplemental oxygen and a walker or a wheelchair to walk more than a few feet. *Id*. She has been hospitalized at least six times during the pendency of this case, on the following occasions:

- Stroger Hospital, 4/12/21-4/21/21 (respiratory failure)
- Stroger Hospital, 7/1/21-7/12/21 (respiratory failure)
- Stroger Hospital, 12/22/21-12/25/21 (respiratory failure)
- Stroger Hospital, 9/30/22-10/15/22 (cardiac arrest, intubated upon admission, implanted cardioverter defibrillator placed)
- Loyola University Hospital, 1/30/23-2/11/23 (respiratory failure, intubated between 1/31/23 and 2/2/23)
- Stroger Hospital, 3/20/23-3/24/23 (respiratory failure)

Given the severity of Ms. Williams' medical conditions, there is a very real likelihood that she will not be able to obtain adequate treatment within the BOP. Indeed, there are persistent medical staffing shortages within the BOP. Kevin Johnson, Feds Struggle to Provide Prison

Medical Care, USA TODAY, Mar. 26, 2016; *see also* Office of the Inspector General, Department of Justice, "Review of the Federal Bureau of Prisons' Medical Staffing Challenges," Evaluations and Inspections Report 16-02 (March 2016).

In recent years the BOP has struggled to provide adequate medical care to thousands of inmates because of persistent staffing shortages that have left some institutions with vacancy rates of 40% or higher. *Id*. While understaffing means that some inmates are more often sent to outside medical facilities to receive care, it also means that inmates' access to medical care is "limited" in the first place. *Id*., citing Office of the Inspector General, Department of Justice, "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons," Evaluation and Inspection Report 15-05 (May 2015).

Additionally, even if Ms. Williams receives appropriate medical care, a sentence involving any term of incarceration may well turn out to be a life sentence, given the precarious nature of her health. Certainly, this is not a just result.

VI. **The Need to Avoid Unwarranted Disparities (§3553(a)(6))**

Lastly, 18 U.S.C. 3553(a)(6) instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In this case, there are a number of similarities between Ms. Williams and co-defendant Rikita Mitchell, who received a time-served sentence.[2] Both Ms. Williams and Ms. Mitchell participated in the conspiracy at the behest of their romantic partners, both were involved in the conspiracy for less than a month, and both played minor roles in the conspiracy. Specifically, Ms. Mitchell admitted she "worked the telephone" with her boyfriend between six and ten times (Dkt. 693 at 9), and participated in at least one undercover buy, while Ms.

---

[2] Ms. Mitchell received a sentence of 6 months' imprisonment but had already been detained for approximately 4 months at the time of sentencing.

11

Williams admitted she participated in three undercover buys and acted as a lookout when her husband sold drugs. Both have a personal history marred by trauma and abuse, and both suffer from mental health conditions as a result. While Ms. Williams falls into a slightly higher Criminal History Category (Category III v. Category II) than Ms. Mitchell, some of Ms. Mitchell's prior convictions are violent in nature and hence more aggravating than the non-violent crimes of which Ms. Williams' is convicted.

There is one factor—Ms. Williams' health—that differentiates Ms. Williams and Ms. Mitchell and weighs in favor of a lower sentence for Ms. Williams. While both women suffer from serious health conditions such as heart failure and hypertension, Ms. Williams suffers from a panoply of *life-threatening* conditions, discussed above. Indeed, Ms. Williams' heart failure was severe enough that in 2022, she experienced cardiac arrest and had to have an implanted cardioverter defibrillator surgically placed. Ms. Williams has been hospitalized *six times* since this case was indicted, each time for multiple days at a time. Ms. Williams constantly struggles to breathe, requires supplemental oxygen, and is not physically able to travel from the lobby of the Dirksen building to the courtroom without a wheelchair.

Ms. Mitchell's sentencing memorandum described just how difficult and painful incarceration was for her in light of her significant but less-serious health problems. Dkt. 693 at 12-13. Routine activities such as count became difficult for Ms. Mitchell to undertake, resulting in disciplinary action. *Id*. at 12. If sentenced to a term of incarceration, Ms. Williams will, *at best*, experience these same unduly harsh conditions. However, given Ms. Williams' additional, serious health conditions, there is a very real chance that a sentence of incarceration could be a death sentence for Ms. Williams.

12

**VII. Conclusion**

For all of the foregoing reasons, a guideline sentence in this case is far greater than necessary to protect the public and accomplish the other purposes of sentencing set forth under 18 U.S.C. §3553. Instead, Ms. Williams respectfully requests this Court sentence her to one-day time served and a term of supervised release with substance abuse and mental health treatment conditions.

                Respectfully submitted,

                s/ Lisa L. Wood
                **LISA L. WOOD**, Attorney for
                Defendant Dorothy Williams.

Lisa Wood
**Gair, Gallo, Eberhard LLP**
1 E. Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 748-6889
lwood@gairgallo.com